Pages 1 - 31

United States District Court

Northern District of California

Before The Honorable Thelton E. Henderson

Dan Valentine,                    )
                                  )
          Plaintiff,              )
                                  )
   vs.                            )          No. C08-5113 TEH
                                  )
NebuAd, Incorporated,             )
                                  )
          Defendant.              )
_____)

                                  San Francisco, California
                                  Monday, July 27, 2009

**Reporter's Transcript Of Proceedings**

**Appearances**:

For Plaintiff:        KimberEdelson, LLC
                      2757 Leonis Boulevard
                      Vernon, California  90058
                 **By: Alan Himmelfarb, Esquire**
                      **Michael Aschenbrener, Esquire**

                      Davis Wright Tremaine, LLP
                      505 Montgomery Street, Suite 800
                      San Francisco, California  94111
                 **By: Thomas R. Burke, Esquire**

For Defendant:        Bergeson, LLP
                      303 Almaden Boulevard, Suite 500
                      San Jose, California  95110-2712
                 By:  Melinda Mae Morton, Esquire

(Appearances continued on next page.)

*Reported By:*        *Sahar McVickar, RPR, CSR No. 12963*
                      *Official Reporter, U.S. District Court*
                      *For the Northern District of California*

                 (Computerized Transcription By Eclipse)

1    **Appearances, continued:**

2    For Defendant:          Covington & Burling, LLP
                             One Front Street, 35th Floor
3                            San Francisco, California  94111
                     By:  **Simon J. Frankel, Esquire**
4
                             Farella Braun & Martel, LLP
5                            235 Montgomery Street, 17th Floor
                             San Francisco, California  94104
6                    By:  **Carl Brandon Wisoff, Esquire**

7                            Jenner & Block, LLP
                             2099 New York Avenue, N.W., Suite 900
8                            Washington, DC  20001
                     By:  **David A. Handzo, Esquire**
9
                             Perkins Coie, LLP
10                           Four Embarcadero Center, Suite 2400
                             San Francisco, California  94111
11                   By:  **David T. Biderman, Esquire**

12                           Davis Wright Tremaine, LLP
                             1919 Pennsylvania Avenue, N.W.,
13                           Suite 200
                             Washington, DC  20006
14                   By:  **Adam S. Caldwell, Esquire**
                          **John D. Seiver, Esquire**

15

16

17                           ---o0o---

18

19

20

21

22

23

24

25

| 1 | **Monday**, **July** **27**, **2009**                        **10:00 a.m.** |

1    **Monday**, **July** **27**, **2009**                                    **10:00 a.m.**

2                                    P R O C E E D I N G S

3                    **THE CLERK:**  Calling civil case number C08-5113,

4    Valentine versus NebuAd.

5                        **MR. FRANKEL:**  Good morning, Your Honor.

6                    Simon Frankel for defendant, Cable One.

7                        **MR. SEIVER:**  Good morning.

8                    John Seiver for defendant Bresnan Communications.

9                        **MR. HANDZO:**  Good morning, Your Honor.

10                   David Handzo on behalf of Century Tel and Embarq.

11                       **MR. WISOFF:**  Good morning, Your Honor.

12                   Brandon Wisoff on behalf of --

13                       **THE COURT REPORTER:**  Sir, please speak up.

14                       **MR. WISOFF:**  Brandon Wisoff.

15                       **THE COURT REPORTER:**  Thank you.

16                       **MS. MORTON:**  Good morning, Your Honor.

17                   Mindy Morton on behalf of NebuAd.

18                       **MR. CALDWELL:**  Good morning, Your Honor.

19                   Adam Caldwell on behalf of Bresnan Communications.

20                       **MR. BURKE:**  Good morning, Your Honor.

21                   Thomas Burke of Davis, Wright & Tremaine on behalf

22   of Bresnan Communications.

23                       **MR. BIDERMAN:**  David Biderman, Your Honor, on behalf

24   of defendants, Wow! and Knology.  Thank you.

25                       **THE COURT:**  Um-hmm.

```
 1              MR. HIMMELFARB:  Good morning, Your Honor.

 2         Alan Himmelfarb on behalf of plaintiffs.

 3              MR. ASCHENBRENER:  Good morning, Your Honor.

 4         Michael Aschenbrener on behalf of plaintiffs.

 5              THE COURT:  Okay, we are going to focus on the

 6    motions to dismiss and the motion to compel arbitration.  I'll

 7    hold until we have resolved the dismissal motions.  So let's

 8    begin with the moving parties, here.  I'll let you decide which

 9    order to go.

10              MR. BURKE:  Your Honor, Thomas Burke of Davis Wright

11    Tremaine on behalf of the Bresnan defendants.

12              And, in anticipation of this morning's hearing, I

13    was designated to speak on behalf of Bresnan, obviously, as our

14    client, but also, I'll take the lead on the arguments in

15    response to the questions of the Court for the ISP defendants.

16              THE COURT:  Okay.

17              MR. BURKE:  But, I suspect I'll have support from

18    other counsel as I go through the points.

19              THE COURT:  Okay.

20              MR. BURKE:  Your Honor, directing the Court's

21    attention to the specific points that the Court asks the

22    defendants to look at, talking about the direct action test for

23    personal jurisdiction as opposed to the contract action test

24    that the plaintiffs rely, I think the answer is very

25    straightforward here, that all of plaintiff's claims are
```

```
 1   sounding in tort.

 2           The very fact that there is a -- an agreement

 3   between NebuAd and the ISPs does not change the fact that all

 4   of plaintiff's claims, non-California plaintiffs, plaintiff's

 5   claims are arising out of tort claims.  And, in that

 6   circumstance, it's appropriate to have the test that the

 7   defendants offer.

 8           And more importantly, there is no case that we are

 9   aware that holds that jurisdiction may be found where the

10   contract is not between the plaintiff and the defendants.

11   There isn't a case that supports applying a different theory.

12           And here, this is a motion, as the Court is aware,

13   that was brought back in January, replies were done in March.

14   Plaintiffs had the opportunity to conduct, under Judge Chen's

15   guidance, jurisdictional discovery, and that jurisdictional

16   discovery didn't change the facts, just as we had anticipated.

17   It didn't change the facts that the plaintiffs -- the

18   defendants here, have no presence in California.  This is

19   Bresnan, but this goes for all of the other ISPs:  No presence

20   in California, no services in California, no subscribers in

21   California.

22           And as a consequence, I believe that that should

23   answer the first -- the first question that the Court raises,

24   although there's actually been a change of fact that the

25   Court's very much aware of:  This is a case where jurisdiction
```

1  is truly only attached by virtue of the contract with NebuAd,

2  but, of course, NebuAd, as an entity, no longer exists, as the

3  Court was told by counsel at the last hearing.  And there has

4  been no effort to -- to bring in a successor entity.  So even

5  that ever-so-slight nexus that was there because NebuAd was

6  here, NebuAd is arguably no longer even here.

7       The second question:  Why doesn't the business you

8  contract with NebuAd in California give rise to personal

9  jurisdiction, the Court asks.  Well, the contract between

10 NebuAd and the ISPs governs claims between them, but it doesn't

11 extend to the benefit of the plaintiffs who have no contact

12 with California.

13      And, you know, the cases supporting that position

14 were cited at page 7 of Bresnan' reply brief, and I won't go

15 into those further, but, to the extent that there were claims

16 and issues between the ISPs and NebuAd, certainly, that

17 contract would have explained it.

18      But plaintiff's claims aren't based on that,

19 plaintiff's claims are arising in the tort.  And none of

20 plaintiff's claims on the merits arise from the contract, so

21 there is no jurisdictional tie to California.

22      The third question that the Court asks, or requests

23 from the Court to apply the minimum contacts test, as explained

24 by the Ninth Circuit in its **_Bancroft_** decision, and the minimum

25 contracts test here is fairly simple to apply because there are

1    no contacts with California.  Again, no equipment, no

2    subscribers, no presence.

3         And I'm, you know, I'm sensitive to the fact, or

4    appreciate the fact that the Court is obviously sensitive to

5    the ***Bancroft*** and ***Masters*** case because it was a case before the

6    Court, but, I think what's particularly significant is to look

7    at the express aiming requirement, as set forth by the Ninth

8    Circuit under ***Bancroft***; it would have this Court find that

9    Bresnan knew that it was likely that the Bresnan plaintiffs,

10   who are all, by plaintiff's allegations, residents of Montana,

11   that plaintiff -- that Bresnan knew that they were likely to be

12   injured in California as a consequence of its agreement with

13   NebuAd.  And that's simply not even remotely reasonable.

14   That's quoting the ***Bancroft*** decision at 223 F.3d at 1087.

15        And lastly, the Court asks if it found the first two

16   prongs of the minimum contracts test to be satisfied, that we

17   assess the reasonableness of the exercise of jurisdiction in

18   this matter; and, Your Honor, I think that that's a good way to

19   wrap up the entirety of both Bresnan and the other ISPs'

20   arguments.  It's -- it's not fair, and it's entirely

21   unreasonable to hold the ISPs subject to jurisdiction here.

22        And it certainly would not be said to be unfair for

23   plaintiffs to sue in a jurisdiction where they live or where

24   the defendants do business, but under either one of those

25   criteria, that would not be California.  There is no interest

1  in adjudicating privacy rights of Montana residents, who are

2  the only plaintiffs against Bresnan, for services received in

3  Montana by non-California residents.

4          Again, I would ask the Court to take in the

5  significance of the fact that NebuAd, which was the only hook

6  plaintiffs had, that hook is diminished, if not completely

7  gone, as well.  And, in light of those facts, and the other

8  facts which are not in dispute and the allegations which are

9  not in dispute, this is a fairly straightforward case, and

10 there is no -- there is no special jurisdiction.

11         **THE COURT:**  Thank you.

12         **MR. BURKE:**  Don't know if Counsel have any

13 additional arguments in response to the questions, but I'll

14 defer to them.

15         Does the Court have any particular questions for me?

16         **THE COURT:**  I don't.  You've answered the questions.

17         **MR. BURKE:**  Thank you.

18         **MR. FRANKEL:**  Your Honor, very briefly --

19         **THE COURT:**  State your name.

20         **MR. FRANKEL:**  Yes.  Simon Frankel for the defendant,

21 Cable One.  Very briefly, in the interest of time, we tried not

22 to have a lot of duplication.

23         I just want to remind the Court of the rule under

24 **Rush versus Samchuk** *(phonetic)* and other cases that

25 jurisdiction must be established as to each defendant.  And, I

1  think that rule is particularly important in this case, because

2  the plaintiff's opposition has sought to amalgamate various

3  pieces of evidence, most of which release to NebuAd, and

4  attribute all that to the ISP defendants.  And, I think you

5  have to look at each defendant, specifically.

6           And then two quick other points.  One is the

7  specific language in **_Bancroft_** and **_Masters_** that express aiming

8  requires that the defendant engage in wrongful conduct targeted

9  at a plaintiff whom the defendant knows to be a resident of the

10  forum state.

11          *THE COURT:*  Um-hmm.

12          *MR. FRANKEL:*  And we have no plaintiffs here who are

13  residents of the forum state.

14          *THE COURT:*  Um-hmm.

15          *MR. FRANKEL:*  So it doesn't make any sense.

16          Finally, just on the reasonableness, this is not a

17  case where there could be multiple litigation for any

18  plaintiff.  Every plaintiff who is named is a -- asserts a

19  claim as to one ISP, and so, no plaintiff would have to bring

20  multiple claims in the forums where they live or any other

21  forum.  So that, I think, further supports that it's not only

22  unreasonable to exercise jurisdiction here, but that there is

23  some corresponding burden on the plaintiffs.

24          Thank you.

25          *THE COURT:*  Thank you, Counsel.

1          Anyone else from defendants?

2                    **(No response.)**

3          *THE COURT:*  You don't have to.

4                    **(Laughter.)**

5          *MR. HANDZO:*  Your Honor, David Handzo on behalf of

6   Century Tel and Embarq.

7          I'll rest on the papers and the presentations of

8   Mr. Burke.

9          *THE COURT:*  Okay, thank you, Counsel.

10         Let's hear from plaintiffs.

11         Why are we before Judge Henderson on this case?

12         *MR. HIMMELFARB:*  I'm sorry, Your Honor?

13         *THE COURT:*  Why are we in front of Judge Henderson

14   in the Northern District of California on this case?

15         *MR. HIMMELFARB:*  Yes, Your Honor.  Good morning.

16   Thank you.

17         Responding to the questions that the Court

18   provided -- and again, thank you for making those available --

19   defendants make the argument, rather forcibly and at length,

20   that to determine the proper application of jurisdiction that

21   there is a tort test for tort actions, and that there is a

22   contract test for contract actions, and that simply by looking

23   at the claims that are set forth in the complaint one can

24   determine which of these measures one should apply.  This

25   assertion, however, I believe, and I believe the case law will

1    demonstrate, is an incorrect reading of the case law.

2              *THE COURT:*  Um-hmm.

3              *MR. HIMMELFARB:*  In fact, personal jurisdiction and

4    specific jurisdiction over an out-of-state defendant is

5    measured by the totality of the conduct engaged in by the

6    defendant.

7              *THE COURT:*  Um-hmm.

8              *MR. HIMMELFARB:*  Personal jurisdiction and specific

9    jurisdiction must comport with due process and it must be fair.

10             In essence, what we have with respect to the

11   jurisdiction question is three tiers of out-of-state actor

12   conduct that are examined for the appropriateness of the

13   application of jurisdiction.

14             In our first tier, we would have such things as a

15   very clear presence by an out-of-state defendant or actor.  We

16   would have a corporate entity, or we would have some kind of

17   business establishment.  We would have offices and bank

18   accounts established.  They would designate an agent for

19   service of process.  Very clear, first tier jurisdiction is

20   properly applicable.

21             *THE COURT:*  Say that again.

22             *MR. HIMMELFARB:*  Well, the first tier would involve

23   the establishment --

24             *THE COURT:*  I understand.

25             And you say that the first tier --

1          *MR. HIMMELFARB:*  Yes, the first tier --

2          *THE COURT:*  That --

3          *MR. HIMMELFARB:*  That first tier would be -- it

4    would very clearly apply -- you could very clearly apply

5    jurisdiction to defendants that fell into that category.

6          *THE COURT:*  Which ones do?  Let's be specific.  Are

7    you saying that these defendants fall into that category?

8          *MR. HIMMELFARB:*  No, I'm not, Your Honor.

9          *THE COURT:*  Okay, that's what I --

10          *MR. HIMMELFARB:*  I'm simply setting forth three

11   different tiers --

12          *THE COURT:*  Okay.

13          *MR. HIMMELFARB:*  By which --

14          *THE COURT:*  We are eliminating the first tier.

15          *MR. HIMMELFARB:*  I'm eliminating the first tier for

16   purposes of this --

17          *THE COURT:*  Go to the second.

18          *MR. HIMMELFARB:*  The second tier --

19          *THE COURT:*  Does that one apply?

20          *MR. HIMMELFARB:*  This one applies.

21          *THE COURT:*  Okay.

22          *MR. HIMMELFARB:*  And that would include executing or

23   performing a contract in this state, continuous and substantial

24   business activities.  By availing itself of the benefits and

25   privileges of operating in a state, an out-of-state actor also

1   assumes the burdens and obligations that are commensurate with

2   obtaining those benefits and privileges.

3           **THE COURT:**  Okay.  I'm weighing:  You got to put

4   things on these hands *(demonstrating)* to -- what are we putting

5   on here?  I remember Geoff Hazard used to talk about this a lot

6   in contracts, and what -- what's California's interest in this

7   case?  What have these guys done that, boy, they're missing

8   with California residents, you got to right it; what is in this

9   case that does that?

10          **MR. HIMMELFARB:**  Well, in this case, Your Honor, the

11  defendants have specifically come to California to engage in

12  illegal activity, to break the law.  They have contracted with

13  a company to take their private personal data.

14          **THE COURT:**  That's NebuAd.

15          **MR. HIMMELFARB:**  Well, they've contracted with

16  NebuAd to monetize something that they have no right to

17  monetize.  And, they have received the monetary benefit of

18  that.

19          They have taken their product, they have sent it to

20  California, and California has sent it back to them in the form

21  of a check.  They are engaging in substantial business activity

22  in the State of California, which activity violates the ECPA

23  and the many -- many California statutes regarding privacy and

24  computer crime.  And by doing so, they've engaged NebuAd to

25  break the law and share with them the profits.

1          So, if I may continue addressing the jurisdictional

2    analysis because the Court has asked the question regarding the

3    application of express aiming, and I would like to, if I may,

4    address that point?

5          **THE COURT:**  Okay.

6          **MR. HIMMELFARB:**  Okay.

7          The third tier that I've been referring in terms of

8    actions of out-of-state actors is if we don't have the first

9    tier of the -- a designation of an agent for service of process

10   and we don't have the second tier, where an out-of-state actor

11   is engaging in direct, continuous, and substantial business

12   with California, then we are left with the third tier.  We

13   don't have the clear activity, so we are looking at more

14   nebulous actions, more amorphous actions of the defendant.  And

15   we still need to measure those actions to determine whether or

16   not jurisdiction is properly assertible against those

17   defendants, and still be fair, and comport with due process.

18         So that, in the third tier, is where we come up with

19   questions like what is to conduct directed to, what exactly did

20   a defendant do that would make jurisdiction over an

21   out-of-state actor proper and reasonable?  So this is what is

22   called the tort test.  And it typically comes into play.

23   Because we don't have those contractual analyses in front of

24   us, because we don't have substantial and ongoing business, we

25   are looking at more tenuous activity, and the questions become

```
1    relevant.  Is this activity properly directed to California?

2    Is this harming someone in California?  Is it -- can it be

3    measured as focused and directed to California residents?

4              But's those are third-tier questions.  We don't have

5    to get there because we are, in this case, involved in the

6    second tier.  What we have --

7              THE COURT:  What do we do with the third tier?  You

8    don't meet that one, or you don't want to deal with it?  What

9    are you saying about the third tier?

10             MR. HIMMELFARB:  I'm saying the third tier doesn't

11   apply.

12             THE COURT:  Okay.

13             MR. HIMMELFARB:  We never need to get there.  We

14   never need to get there because we have a second-tier analysis

15   here.  The second-tier analysis is we have substantial and

16   continuous business activity engaged in by all the defendants.

17   All the defendants stepped up to and engaged in a relationship

18   with NebuAd that NebuAd calls "partnerships" in all the

19   documents that we've been able to obtain; that NebuAd refers to

20   as a relationship with these defendants by which the defendants

21   will provide this data to them and NebuAd will sell that data

22   for them, will monetize that data for them, will place those

23   ads for them and then give them money for that data.

24             And what we have here is we have defendants, all of

25   whom in all of their papers, who have stepped back from this
```

```
1    transaction and said, in essence, we didn't know what they were

2    doing, we merely let them do this, when, in fact, they engaged

3    in very direct activity, which calls into play their actions

4    and activities in relationship to the State of California.

5            In our brief, at Appendix A, we quote some

6    paragraphs from Bresnan Communications' contract.  I'll simply

7    read some of those paragraphs just from Bresnan's contract into

8    the record because I think that they very substantially portray

9    the amount and the extent of activity that the defendants

10   engaged in to -- to make themselves amenable to having

11   jurisdiction asserted in the State of California.

12           THE COURT:  Go ahead and read it for me.  What did

13   they do to say we -- we are submitting ourselves to California

14   jurisdiction beyond dealing with NebuAd?

15           MR. HIMMELFARB:  Well, it's their dealings directly

16   with NebuAd, which was both the conduct that was illegal and to

17   conduct which bring them into the fold of California by

18   which --

19           THE COURT:  You've already -- you were suggesting

20   there is something else beyond that; is that what they've done,

21   or is there something else?

22           MR. HIMMELFARB:  Well, by walking out of a bank and

23   leaving the key with someone outside whom you know is going to

24   go in and rob the bank and then saying, make sure you leave my

25   cut at my house, that's conduct that is direct directly
```

```
 1    involved in the wrongdoing.  And we're alleging and

 2    asserting --

 3             THE COURT:  Criminal wrongdoing, you are certainly

 4    right there.

 5             MR. HIMMELFARB:  Yes.  And we're asserting that the

 6    wrongdoing in this case, which consists of the wiretapping and

 7    unlawful taking of data that doesn't belong to them, was

 8    accomplished by the ISPs.  It was done by the ISPs in

 9    cooperation with and working with NebuAd.  It was done at their

10    locations.  But what happened to that data after it was taken

11    was to send it to California, where it was monetized and where

12    -- and from which they profited.

13             This was a continuous pipeline that was opened

14    between Neb -- between the ISPs and California.  So it's not

15    like California is a state drawn at random from the activities

16    that the defendants engaged in.  There was a 24-hour continuous

17    communication of this personal and private data to the State of

18    California and back from the State of California.

19             THE COURT:  Okay, as I understand your argument, we

20    don't -- first tier doesn't apply, we don't need to get to the

21    third tier.  What cases are you relying on for your second

22    tier?

23             MR. HIMMELFARB:  Yes, Your Honor.

24             In fact, all of the relevant case authority which

25    discusses the application of jurisdiction in the context of the
```

1    so-called contract test and the so-called tort test, all

2    support this -- this assertion.

3            For example, **_Schwarzenegger Versus Fred Martin_**

4    **_Motor_**, which involved a case where an out-of-state auto

5    dealership utilized an image of Schwarzenegger without any

6    compensation or involvement or consent from Mr. Schwarzenegger.

7    And the Court, in that case, first went through the analysis of

8    how do we determine whether or not the -- which tier to apply

9    to this action?

10           And, at page 803 of the opinion at 37 4 F. 3rd,

11   Schwarzenegger does not point to any conduct by Fred Martin in

12   California related to the advertisement that would be readily

13   susceptible to purposeful availment.  Rather, the conduct of

14   which Schwarzenegger complains, the unauthorized inclusion of

15   the photograph and the advertisement and distribution in the

16   _Akron Beacon Journal_ took place in Ohio, not in California.

17           Fred Martin received no benefit, privilege, or

18   protection from California in connection with the

19   advertisement, and the traditional quid pro quo justification

20   for finding purposeful availment thus does not apply.

21   Therefore, to the extent that Fred Martin's conduct might

22   justify the exercise of personal jurisdiction in California,

23   that conduct must have been purposefully directed at

24   California.

25           So, what the Court did in **_Schwarzenegger_** was look at

1  the second tier to see whether or not there was some basis in

2  substantial or continuing business by which the privileges and

3  benefits of operating in California would permit the

4  application of the burdens of being sued in the State of

5  California.  And finding none, the Court went on to the third

6  level.

7          The case of **_Yahoo!, Inc., versus La Gig Contraire_**

8  *(phonetic)* which is at 433 F.3d, 1199, this is a case in which

9  the Court determined that the case was neither a tort nor a

10  contract case.  And it went through the same analysis, but what

11  it stated more clearly than any other case is, "In any personal

12  jurisdiction case we must evaluate all of a defendant's

13  contacts with the forum state, whether or not those contacts

14  involve wrongful activity by the defendant.  And we, therefore,

15  analyze all the defendant's contacts with California relating

16  to its dispute with *Yahoo!* irrespective of whether or not they

17  involved wrongful actions by defendants."

18          And that's at pages 1207 and 1208.

19          So in the case of **_Boschetto versus_** -- *(phonetic)*

20          **_THE COURT:_**  What were the contacts there that gave

21  California jurisdiction?  Don't read quotes from there; what

22  were the contacts?

23          **_MR. HIMMELFARB:_**  The contacts in the -- in the

24  **_Yahoo!_** case was with third-level tier questions.  What is the

25  impact of the activity that was involved in the issuance of a

1    -- of a court injunction in a court in France, and how would

2    that impact a California defendant.

3            **THE COURT:**  What did they do?  What did *Yahoo!* do,

4    or the defendant, that the Court said, you've availed yourself

5    of -- California has jurisdiction?  What were the specific

6    activities?

7            **MR. HIMMELFARB:**  Well, the specific activity, it was

8    *Yahoo!* seeking to gain jurisdiction over the French company.

9            **THE COURT:**  Over the what?

10           **MR. HIMMELFARB:**  Over a French company.  And what

11   the French company did was it sought judicial process in France

12   and obtained a preliminary injunction against *Yahoo!* in France,

13   which order was never enforced in California.  But the

14   potential for enforcing that order had a third-tier impact, or

15   potential impact upon *Yahoo!*.  And, on that basis, jurisdiction

16   was found.

17           In the case of ***Boschetto versus Frank Boucher***

18   ***Chrysler Dodge Jeep***, the concurring opinion in that case --

19   this is at 539 F.3d 1011.

20           **THE COURT:**  The concurring opinion?

21           **MR. HIMMELFARB:**  Yes, well, the main opinion is not

22   inapposite to this, but the concurring opinion simply goes

23   through the analysis, whereby Judge Rymer steps through the

24   purposeful availment --

25           **THE COURT:**  Judge who?

1          **MR. HIMMELFARB:**  Judge Rymer -- goes through the

2     purposeful availment analysis, and, finding no purposeful

3     availment activity, then walks through the purposeful direction

4     activity.  It's simply a process by which the courts look to

5     see whether or not a defendant has engaged in activities that

6     either are first tier very clearly applicable to apply

7     jurisdiction; second tier, where they engage in substantial

8     business activities by which the benefits and burdens of

9     operating in the state are proper.

10          And if none of those exist, then you look to the

11    third tier.  And in that third tier is where the question that

12    the Court has asked in its questions at the -- that it issued

13    at the beginning of the hearing, that those come into play.

14          ***CompuServe, Incorporated, versus Patterson***, which is

15    a Sixth Appellate Court decision at 89 F.3d 1257, this was a

16    case in which the factual situation is most like ours.  This is

17    an out-of-state individual who lived in Texas.  He sent files

18    to CompuServe based in Ohio, and the CompuServe made those --

19    monetized those files for the plaintiff -- I'm sorry, for the

20    defendant, Patterson, who was based in Texas.

21          Patterson sent a number of these files.  This was an

22    ongoing relationship.  And CompuServe's purpose was to make

23    money, take a percentage, and then send the money, remit the

24    money back to Texas.

25          In that case, which is very similar to this case,

```
1    because in this case the defendants send the data to California

2    for monetization, and the California company sent a check back

3    to the defendants.  In that case, the jurisdiction was found to

4    be proper based upon the contractual relationships of the

5    parties because there was a contractual relationship between

6    the gentleman in Texas and CompuServe in Ohio, because there

7    was continuous activity, because there was profit.  The

8    jurisdiction was appropriate.

9            But where the defendants distinguish this case is

10   they're saying, well, that's a contract action; but, in fact,

11   in CompuServe, the relief sought was a declaration that

12   CompuServe had not infringed on any common law trademarks and

13   that it was not otherwise guilty of unfair or deceptive trade

14   practices.  Those are actions sounding in tort.

15           So, we look to a contractual relationship, even

16   though we've got an action clearly sounding in tort, and we

17   find that there is a substantial and continuous contractual

18   relationship which involved a benefit and which involved

19   privileges of utilizing Ohio's CompuServe servers and sales in

20   order to get money back.

21           And we never had to have to get to the third-tier

22   question.  We are only at the second tier, which is, is there a

23   contractual relationship or substantial business activity that

24   makes the exercise of jurisdiction proper?

25           That's exactly what we have in this case, Your
```

1    Honor.  We've got NebuAd performing a services, but we have all

2    of the ISPs by no means stand-offish or innocent actors.  Every

3    one of them knew what they were doing.  Every one of them knew

4    what was involved.

5            They contractually negotiated their rights,

6    obligations, and duties with NebuAd.  Those rights,

7    obligations, and duties gave them certain privileges, to be

8    able to have control over what would be done with these

9    appliances, with these devices, with this information, with the

10   money that was derived from the information, with the

11   accounting of how that money was derived and with when and how

12   that money was sent back to them, so with calculating the

13   revenue share and with the ability to audit.

14           So, all of these activities, which were

15   contractually negotiated for by all of the defendants, clearly

16   evidence the -- the assumption of the benefits and privileges

17   of operating and profiting from activity in California such

18   that the application of jurisdiction and the amenability to be

19   sued in the State of California is proper and appropriate.

20           **THE COURT:**  Defense counsel pointed out that NebuAd

21   may not even exist; is that relevant in any way?

22           **MR. HIMMELFARB:**  I don't think it is, Your Honor,

23   the fact that NebuAd -- well, first of all, NebuAd is not

24   entirely out of existence, but aside from that point, the fact

25   that these actors engaged in business in California with a

1    California entity at the time that was an existing entity means

2    that what has subsequently happened to NebuAd has no import or

3    effect upon the basis for jurisdiction on the defendants.

4           It's the defendant's actions that is what gives rise

5    to the jurisdictional application here, not NebuAd's actions as

6    being somehow contingent upon their continued existence in

7    order for the application of jurisdiction to be properly

8    applied to the defendants.

9           **THE COURT:**  Okay.

10          Are you satisfied that you've answered all my

11   questions here today?

12          **MR. HIMMELFARB:**  The final point on the -- on the

13   page for all parties addresses the reasonableness of

14   jurisdiction in this case, and I don't necessarily think that

15   the Court wants a rehashing of the points that we set forth in

16   the brief because we did go through a seven-point analysis of

17   the reasonableness, but in this case, what we are looking at is

18   because the activities that the ISP defendants contracted for

19   and engaged in NebuAd with were primarily activities that

20   occurred by, through, and in California, the remnants of NebuAd

21   is here in California, witnesses here in California, former

22   employees here in California.  The documents and evidence about

23   which we discussed at the last hearing before Your Honor is

24   here in California.

25          The application of the law in this case as to one

1    will be applicable to all; thus, having all of these defendants

2    in one tribunal to assess all of these claims in one action I

3    think is appropriate.  And I think it promotes judicial

4    economy.

5            In addition, the -- the burden on defendants

6    litigating in California I think has been addressed in a number

7    of cases recently, that, given the availability of e-filing,

8    the availability of local counsel, the availability of adequate

9    transport, the question of burden of litigating in a

10   jurisdiction that is not their home state I think is -- has

11   received substantially less of an impact in this consideration

12   than it did 50 or 80 years ago when -- when the doctrine would

13   have been more applicable.

14           And I think that's all I would have to say, Your

15   Honor.

16           **THE COURT:**  Okay.  Thank you, Counsel.

17           **MR. BURKE:**  Your Honor, I didn't have the fortune of

18   studying under Professor Hazard, but I did use his textbook in

19   law school, so I'll identify the three tiers that counsel has

20   identified as what they are:  No general jurisdiction, that is

21   the first tier, that's a given.

22           They talk about the second tier, the purposeful

23   availment, but they don't answer the _**Barnes**_ test that the Court

24   specifically asks them to apply.  And, I think that is fatal

25   when you do apply those facts.

1             But the last tier that they suggest is the fairness

2     test, which they only belatedly in the last bit of the argument

3     address.   Under the *Yahoo!* decision, one of the three cases

4     that they show to the Court or ask as support, *Yahoo!* makes it

5     very clear, as do we in citing **Yahoo!**, that that fairness

6     requirement, the exercise of jurisdiction must comport with

7     fair play and substantial justice, is required.   It's not a

8     test that they can simply jettison and say, we want to play

9     here in tier two, we satisfied tier two, which they don't.   It

10    just doesn't work that way, it's a required element.

11            The Court specifically asked Counsel to come up with

12    cases, identify the cases that show the contractual

13    relationship is sufficient here to confer jurisdiction on the

14    plaintiffs; none of the cases that they cite stand for that

15    proposition, they just don't.   They are cases that refer to a

16    direct jurisdictional relationship between the plaintiff and

17    the defendant.

18            But here, the plaintiffs are not harmed and the

19    plaintiffs are not California residents.   And most importantly,

20    applying, again, the test that the Court asks counsel to apply

21    the facts to, they needed to anticipate, Bresnan needed to

22    anticipate harm to California residents coming out of the

23    contract that they had with NebuAd, and that clearly is not

24    something that could have been anticipated, or it wasn't

25    anticipated, and can't, therefore, satisfy that very specific

1    jurisdiction requirement.

2              Your Honor, I don't believe there is -- I don't

3    believe there is any fairness in having jurisdiction be

4    conferred before the Court.  I think the Court asks the most

5    apt question, why are we before you, and I don't believe,

6    respectfully, that any of the ISPs have any basis for being

7    before you.  There is no jurisdiction.

8              They've had the opportunity to -- plaintiffs have

9    had the opportunity to explore that in discovery; the facts

10   haven't changed.  There is no harm to a California resident in

11   California.  And this Court has no reason to exercise

12   jurisdiction here, especially when it does not satisfy the

13   *Yahoo!* test or -- the tests that the Court is so focused on.

14             If the Court has any further questions, I'd be happy

15   to respond.

16             **THE COURT:**  I don't have of you, Counsel.

17             **MR. BURKE:**  Thank you.

18             **THE COURT:**  Thank you.

19             Just one question.  Respond to the last statement,

20   and only that; is counsel right that the contract doesn't

21   contemplate any harm to California residents?  Or, turn the

22   question around; does it contemplate harm to California

23   residents?  And if so, what is it?

24             **MR. HIMMELFARB:**  The contract provided for --

25             **THE COURT:**  I know, I've read it.  We did a lot of

 1   work.  She read it more than I did.  Answer my question.

 2              **MR. HIMMELFARB:**  I believe that -- I believe that it

 3   can be asserted that the contracts envision harm to California

 4   residents in the fact that the communications between the ISP

 5   subscribers and residents of California are almost certain to

 6   have occurred.

 7              Indeed, many of the -- as we stated in our brief,

 8   many of the largest Internet companies, including *Google* and

 9   *Yahoo!*, are based in California, and so those communications

10   were also subjects to interception and wiretapping.

11              So the reach and the breadth of the activities

12   engaged in and contemplated by the contracts affects not only

13   the subscribers of the ISPs, but, indeed, everyone worldwide,

14   because the communications over the Internet are not limited by

15   state boundaries, and they always involve two-way

16   communications, they always involve communications from the ISP

17   subscriber to either some company or some entity or some

18   resident of another state via e-mail, and those activities, all

19   of which would have been subject to interception and

20   wiretapping.

21              So, as far as a geographic limitation of the conduct

22   contemplated by the agreements, I don't think that it's

23   possible to say that there is a geographic limitation to those

24   agreements.  You tap into the Internet and you tap everybody,

25   and you tap everybody everywhere.

```
 1            So that would be my response, Your Honor.

 2            THE COURT:  In this age of technology, there are

 3    just no boundaries.  Any court, any place can say technology,

 4    you can tap in, we'll take it.

 5            MR. HIMMELFARB:  Well, Your Honor --

 6            THE COURT:  Jurisdiction; is that the argument?

 7            MR. HIMMELFARB:  No, because, again, going back to

 8    the three different tiers --

 9            THE COURT:  Okay.

10            MR. HIMMELFARB:  If you've got conduct, you are

11    going to have to look to see whether or not that conduct was

12    purposefully directed to the defendants -- I'm sorry,

13    purposefully directed to --

14            THE COURT:  This one was purposely -- okay, okay,

15    okay.

16            Okay, thank you, Counsel.

17            MR. HIMMELFARB:  Thank you.

18            THE COURT:  The matter is submitted.

19            Are there any time constraint I need to be aware of?

20    I know there are other things floating out there, including the

21    discovery; what do I need to know as I proceed with this

22    motion?

23            MR. BURKE:  No, Your Honor.

24            THE COURT:  Everything's okay?

25            MR. HIMMELFARB:  Yes, Your Honor.
```

1          *THE COURT:*  Okay.

2          The matter is submitted then.  Thank you.

3          *MR. BURKE:*  Thank you.

4                    **(Proceedings adjourned at 12:19 p.m.)**

5

6                         **---o0o---**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF REPORTER</u>

I, Sahar McVickar, Official Court Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said proceedings as bound by me at the time of filing.  The validity of the reporter's certification of said transcript may be void upon disassembly and/or removal from the court file.


<u>/s/ Sahar McVickar</u>

Sahar McVickar, RPR, CSR No. 12963

Friday, July 31, 2009