IN THE UNITED STATES DISTRICT COURT **REDACTED**
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| KATHLEEN KIRCH, et al., | Case No. 10-2047-JAR-GLR |
| Plaintiffs, | DECLARATION OF ALISSA COOPER |
| EMBARQ MANAGEMENT CO., et al., | |
| Defendants. | |

## DECLARATION OF ALISSA COOPER

I, Alissa Cooper, hereby declare and state:

I am familiar with and have personal knowledge of the matters set forth in this declaration and if called upon to do so, could and would testify competently thereto, except where my knowledge is based upon information and belief, and as to those matters, I understand and believe them to be true.

**Purpose**

1. I make this declaration as an expert in the field of Internet technology and online privacy.

2. I was retained by plaintiffs' counsel to express my opinion about the Embarq/NebuAd behavioral advertising system, whether that system involved "deep packet inspection," the extent to which Embarq disclosed its customers' Internet traffic data to NebuAd, the role of human interpretation in the design and operation of the behavioral advertising system, and the adequacy of Embarq's notice and choice mechanisms for protecting customer privacy.

**Relevant Qualifications and Background**

3.      My professional career has focused on researching and analyzing Internet technologies and their implications for privacy, openness, and other public interest values. In five years at the Center for Democracy and Technology, where I served first as a policy analyst and now as Chief Computer Scientist, I have researched and reviewed a broad spectrum of Internet technologies, including web-based applications, advertising software, networking technologies, location-based services, and deep packet inspection (DPI) systems. In addition to conducting my own original research, I serve as CDT's technical liaison to Internet engineers working both in the industry and within technical standards bodies.

4.      CDT is a non-profit public policy organization with expertise in technology, policy, and law. As one of the leading public interest voices on Internet civil liberties issues, CDT serves as a trusted advisor to policymakers across the federal government and to Internet companies of all kinds. In its 15-year history, CDT has been invited to testify before Congress over one hundred times.

5.      Together with CDT staff I have co-authored dozens of analyses, reports, and comments to government agencies about a range of Internet technologies and policy issues. These have included a framework for assessing the privacy impact of behavioral advertising, a series of reports detailing our original research into the inner workings of advertising software, half a dozen submissions to the Federal Trade Commission concerning online privacy, and an equal number of submissions to the Federal Communications Commission concerning the role of Internet service providers in

controlling network traffic. I have authored over 50 blog posts on the CDT website, including a series of posts related to the use of deep packet inspection for behavioral advertising.

6. I have also published articles independently in peer-reviewed academic journals, including ACM Transactions on the Web and IEEE Security and Privacy. I am the author of "Doing the DPI Dance: Assessing the Privacy Impact of Deep Packet Inspection," which will be published this spring as a chapter in an interdisciplinary volume about privacy being published by Scarecrow Press. I recently published an excerpt as part of an invited guest post on DeepPacketInspection.ca, a Canadian DPI website.

7. As CDT's Chief Computer Scientist I have often been invited to speak about technical and policy topics. I have spoken at technical conferences and events including the Workshop on Web Search Click Data, the Second International Workshop on Location and the Web, the W3C Workshop on Privacy for Advanced Web APIs, the Privacy Open Spaces conference, and the Computers, Freedom and Privacy conference. I have given invited talks at the Harvard Center for Research on Computation and Society and the Stanford Media Law Resource Center. I have addressed companies and industry trade associations, including Google, the GSM (mobile) association, CableLabs, and the Online Publishers Association.

8. In 2008 I was invited to provide sworn testimony to the House Committee on Energy and Commerce's Subcommittee on Telecommunications and the Internet at a hearing entitled, "What Your Broadband Provider Knows About Your Web Use: Deep

Packet Inspection and Communications Laws and Policies." I have also appeared before the Federal Trade Commission three times to address online privacy issues related to Internet cookies, location-based services, and mobile payments.

9.  I am an active participant in the Internet Engineering Task Force (IETF), one of the world's premier Internet standards organizations. I am a member of the IETF's Internet Architecture Board (IAB), a key leadership committee that oversees the architectural development of the Internet and Internet protocols. I also co-chair the IETF's Geographic Location/Privacy (GEOPRIV) working group.

10. In 2010 I served as a consultant at British Telecom (BT). At BT I conducted research into network traffic management that involved analysis of data furnished by deep packet inspection equipment.

11. I received my Bachelor of Science and Master of Science degrees in Computer Science from Stanford University. While studying at Stanford I served as a research assistant in the Computer Science department, working within a research group focused on computer security issues. I am currently a doctoral student at the Oxford Internet Institute where my research focuses on why Internet service providers are targeting particular Internet applications as a means to manage the flow of network traffic.

**Materials Considered**

12. In reaching the conclusions stated in this declaration, conducting my analysis related to specific facts of this case, in addition to my own research, I consulted

the following documents provided to me by plaintiffs' counsel from KamberLaw, LLC and Panish Shea & Boyle LLP:

a. 

13. In addition, I referred to the following documents and/or publications:

  a. Testimony of Alissa Cooper before the House Committee on Energy and Commerce, Subcommittee on Telecommunications and the Internet, "What Your Broadband Provider Knows About Your Web

          Use: Deep Packet Inspection and Communications Laws and Policies," http://cdt.org/files/pdfs/20080717cooper.pdf.

    b.    Testimony of Leslie Harris before the House Committee on Energy and Commerce, Subcommittee on Communications, Technology and the Internet, "The Privacy Implications of Deep Packet Inspection," http://www.cdt.org/privacy/20090423_dpi_testimony.pdf.

    c.    NebuAd – Transforming online ad industry (video from AO conference), http://www.blinkx.com/watch-video/nebuad-transforming-online-ad-industry/g7uPKiMDzvvYlNxZmzuFaQ.

    d.    NebuAd – Transforming online ad industry (video from OnMedia conference), http://www.blinkx.com/watch-video/nebuad-transforming-online-ad-industry/GbG0waFHU3g0lTGkEJWcnA.

My opinions in this case are also based on several meetings and calls that I had with NebuAd CEO Bob Dykes during 2007 and 2008.

**Summary**

    14.    In my opinion, NebuAd installed deep packet inspection (DPI) equipment into Embarq's network in order to conduct behavioral advertising. Embarq diverted all Internet traffic for customers in the deployment area to the NebuAd equipment. The NebuAd equipment used DPI to inspect and extract web addresses, search terms, and ads viewed from the raw traffic it was sent by Embarq. This extracted information, which included virtually all of customers' web activity – including sensitive and personal information – was then sent on to other NebuAd servers, the footprint server and the operations server, where it was used to make inferences about customers' preferences and build behavioral profiles about customers that were later used to serve targeted advertisements. The processes of selecting behavioral categories and mapping customers'

web activity to those categories reflected substantial human interpretation on the part of NebuAd employees.

15. In my opinion, both the notice and the opt-out mechanism offered to Embarq customers were highly inadequate. The notice was buried in a privacy policy that virtually no Embarq customer ever would have thought to read, and it failed to inform customers that Embarq was divulging all of their Internet traffic to a third party. The opt-out mechanism failed to prevent NebuAd and Embarq from employing the most privacy-invasive aspects of the system, namely, divulging customers' Internet traffic to NebuAd, having that traffic analyzed to extract all web activity (including all searches), and transmitting that information to another NebuAd server.

16. The reasons for my reaching these conclusions are explained below.

**NebuAd-Embarq Arrangement**

17. Behavioral advertising is the practice of collecting, aggregating, and analyzing information about consumers' Internet activities for the purpose of serving them targeted advertisements. Traditional behavioral advertising has been undertaken since the late 1990s by advertising network companies that contract with websites to be able to collect data about the people who visit those sites. A traditional behavioral ad network builds profiles of individual web users by tracking their activities on sites participating in the network. Many ad networks accomplish this tracking by placing a cookie with a unique identifier on a user's computer and tying the user's behavioral profile to that identifier. Consumers' profiles are later used to serve targeted ads to those

users on other websites. If a user visits a series of sports websites and later visits a news site, for example, he or she may be shown an ad for golf clubs or baseball tickets on the news site.

18. NebuAd was a behavioral advertising company whose technology and business model differed from this traditional setup. Rather than partnering with a network of participating websites, NebuAd partnered with Internet service providers (ISPs), including Embarq, to do its data collection. NebuAd's technology was installed within the ISPs' networks to track the individual web browsing activities of the ISPs' customers. This means that NebuAd received each individual's web browsing data directly from the ISPs and analyzed the content of that data in order to create a profile of each individual's online behaviors and interests. As customers of the ISPs surfed the web and visited other websites, NebuAd served them targeted ads based on their behavioral profiles.

19. In the specific case of the Embarq deployment, NebuAd's 'Ultra-Transparent Appliance (UTA) was installed directly within the Embarq network. For customers within the service area of the deployment, this meant that all of their Internet traffic – including web browsing, web searches, email, chat, VOIP, and file downloads and uploads – was flowing into the UTA. The UTA would analyze all of the incoming raw traffic to identify individual web addresses (also known as URLs), search terms, ad clicks, and other data related to individual customers' web behaviors. The addresses that the UTA extracted were full web addresses – not just the domain names in the URLs, but the entire addresses, including subdirectories and request parameters. All the pieces of raw web traffic data that the UTA extracted were sent to two other NebuAd servers – the

"footprint" server and the "operations" server – for further processing and assembly into behavioral profiles associated with each customer that could then be used to serve those customers targeted ads.

**Deep Packet Inspection (DPI)**

20. The technology used by NebuAd is known as "deep packet inspection" ("DPI"). The easiest way to understand deep packet inspection is to consider an analogy to the postal mail system. In the postal system, letters travel through the system in envelopes, each of which is addressed to its appropriate recipient and contains the return address information of the sender. On the Internet, communications are broken into "packets." This is true for all kinds of Internet communications: web browsing, email, file transfers, online gaming, and so on. A single packet consists of two parts: a "payload," which is the actual data inside the packet, like the letter inside an envelope; and a "header," which contains the routing information that directs the packet to its destination (or back to the sender in case of errors), like the address and return address on the outside of an envelope. For an Internet packet, the IP addresses of the recipient and sender, respectively, are equivalent to the address and return address on an envelope in the mail.

21. As postal employees and equipment move mail through the system, they inspect the addressing information on the outside of each envelope to determine the next step in directing the mail to its final destination. The same is true for the Internet – the devices in the middle of the network responsible for routing data inspect packet headers to decide where each packet should go next. This is sometimes called "shallow packet

inspection" because the analysis is limited to the header information that is automatically exposed (by necessity) to every router on the Internet. Just as the postal mail simply cannot be delivered without postal employees and equipment inspecting addresses, neither can Internet communications be delivered without routing devices inspecting packet headers. But this shallow sort of inspection does not reveal the actual content of the web browsing session, email, or VoIP call that a particular packet may contain, just as looking at an address on an envelope does not reveal the content of the letter inside.

22.   Deep packet inspection is the equivalent of postal employees opening envelopes and reading the letters inside. To do DPI, network devices examine the payload of a packet – the actual data the packet carries – in addition to the packet header. To inspect a packet deeply means to examine the contents of the web request, email, instant message, or whatever other data the packet contains. Unless the content of the packet is encrypted (as with most online purchases and bank transactions), the entirety of the packet can be analyzed with DPI.

23.   One slight complexity of Internet packets is that a packet payload itself may contain some additional addressing information that is supplemental to the IP addresses available in the packet header. When sending an email, for example, the email address of the recipient appears in the packet payload, not in the packet header. Likewise for web browsing, the address of the web page that a user is trying to reach appears in the payload, not the header. Even if this application-related addressing information is the only kind of information inspected, the inspection still constitutes DPI, and still goes beyond the basic network functionality required to route packets to their destination

computers. The additional addressing information is sometimes referred to as "application headers" because the information is specific to particular Internet applications (web browsing or email, for example). But whether application headers or application data are examined (or both), that examination still constitutes deep packet inspection.

24.     Another way to describe DPI is in the context of the Open Systems Interconnection (OSI) Reference Model, a generic network model that is often used to describe the layered structure of the Internet. The OSI model consists of seven layers: (1) physical, (2) data link, (3) network, (4) transport, (5) session, (6) presentation, and (7) application. These layers form a complete representation of the network, from its physical capabilities (electrical signals sent on a cable or telephone wire, for example) at layer 1 to applications and services (email or web browsing, for example) at the highest layers. The IP protocol sits at layer 3. DPI occurs at layers 4 through 7.

25.     DPI is a generic tool that can be used by ISPs for a variety of purposes. For example, DPI may be used to detect security threats, manage network traffic load, or to monitor the usage volumes of particular applications or services. These activities form part of the ordinary, day-to-day operations of ISPs seeking to ensure the security of their networks, protect against network congestion, or better plan for capacity upgrades. In essence, these kinds of DPI uses are targeted at ensuring or improving the integrity or performance of the network itself. These uses stand in contrast to Embarq's use of the NebuAd DPI system, which was not related to any particular network functionality or performance issue within Embarq's control and lasted for only a limited time. The use of

DPI for behavioral advertising by Embarq or any other ISP is distinctive in that its purpose is unrelated to improving or safeguarding the ISP's network infrastructure.

**NebuAd/Embarq Use of DPI**

26. The NebuAd UTA installed in the Embarq network used DPI to cull web browsing information about Embarq's customers. All network traffic for customers in the deployment area was directed from a node in the Embarq network to the UTA. NebuAd's documentation and public statements by NebuAd CEO Bob Dykes indicate that the NebuAd UTA inspected traffic for the purpose of extracting (at the very least) web addresses, search terms, and ads viewed, all of which reside in packet payloads. There is simply no way of extracting this information without looking beyond the IP addressing information contained in each packet.

27. Because the NebuAd UTA was focused on collecting web searches and browsing behavior, it automatically collected this information and transferred it to the footprint server and operations server, even in cases where the information was sensitive or personal. For example, the URLs of online HIV support groups, bankruptcy advice sites, and religious information sites would have been identified by the DPI appliance just like any other URLs. Every such site (other than those that may have resided on a NebuAd-created blacklist that may have existed on the UTA) was identified and transferred to NebuAd's central servers, as described in NebuAd's FTC response (p. 9). Searches that customers conducted for their own names, or for driving directions originating at their own home addresses, would have generated search terms containing

those pieces of personal information which would have likewise been inspected by the NebuAd UTA in its process of detecting all search terms and transferred on to the other servers.

28. NebuAd stated that such sensitive information "flushes out" of the system, but in order for it to have flushed out, it first flowed in and was inspected by the UTA. Moreover, according to NebuAd documentation, the elimination of raw web traffic data only occurred after such data was sent from the UTA to other NebuAd servers. This means that all web addresses, search terms, and ads viewed, including those of a sensitive or personal nature, needed to first be extracted from the raw traffic flow by the DPI technology in the UTA and sent to another server before later being discarded.

29. Embarq and NebuAd both stated that raw traffic data was discarded after being used to build customer profiles and that steps were taken to reduce the identifiability of data within the NebuAd system. However, the fact that data may have been de-identified or discarded is orthogonal to the question of whether raw traffic data was collected and used in the first place – it is quite possible to collect data, make inferences about the data, send the data across the network to other servers, and thereafter strip identifiers from the data or discard it altogether, which is precisely what NebuAd did with the Embarq customer data. Just because data is altered or deleted at some point in time does not prevent the data from having been collected, analyzed, or transmitted at a previous point in time. Indeed, it would be impossible to de-identify or delete data that one never possessed in the first place.

30. Furthermore, NebuAd's own documentation characterizes what it was doing as "information collection." The NebuAd opt-out page offered users the choice to "Exclude me from NebuAd's information collection and targeted ads." Indeed, "collection" is an appropriate way to characterize the UTA's use of DPI to inspect the flow of all traffic generated by subscribers in the deployment area, pluck out web addresses, search terms, and ads viewed, and send those data items to the footprint and operations servers.

**Role of Human Interpretation**

31. The goal of NebuAd was to finely segment ISP customers according to detailed characterizations of their interests developed on the basis of their web activity. Customer profiles were built with a tremendous level of detail, down to specific product categories of interest (German sedans, for example), or even specific brands (Sony cameras or Disney vacations, for example). NebuAd developed 800 of its own categories and also provided for advertisers to build their own unique categories. The aim of using such detailed categories was to allow advertisers to better target their ads to audiences more likely to respond to them.

32. NebuAd's selection of ad targeting categories that were offered to advertisers reflects substantial human decisionmaking. NebuAd employees created interest categories to suit the needs of advertisers and advertising agencies, and advertisers had full discretion in choosing which audiences to target with their ads.

33. In the case of Embarq, the customer profiles used to target ads were created by sending all network traffic to the NebuAd UTA, having the UTA extract virtually every web address, search term, and ad viewed, and having that data sent to a NebuAd server where it was used to categorize the interests of each customer. The web traffic data extracted through the NebuAd DPI formed the basis for the customer profiles; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As with the creation of the ad targeting categories themselves, determining how to map a user's web activities to particular interest categories was a process that required substantial analysis and decisionmaking on the part of NebuAd employees. The technology used by NebuAd to classify the interests of Embarq customers represented human interpretations of which kinds of web activities correlated to highly specific interest categories. The process of classifying customers was one that involved both extracting meaning from raw web traffic data and passing judgment about how the raw traffic data corresponded to customers' personal interests.

**Embarq's Notice to Customers**

34. Embarq explained in its letter to House representatives that it altered its privacy policy two weeks prior to deployment to include language describing the use of customers' web browsing data for advertising purposes. The language did not make any mention of the fact that a third party was involved in the advertising system.

35. The notice used by Embarq failed to meet even relatively lax standards of robustness for meaningfully informing subscribers about their privacy. It was posted in a

policy that few customers likely ever read (even before they signed up for Embarq's Internet service) or even knew existed. It was not proactively disseminated to customers in any meaningful way. Even if one user in a household happened to review the updated policy, other household users sharing the same connection may have been entirely unaware of the change. And perhaps most importantly, the notice failed to include crucial details about the use of customers' data, including the fact that all of their Internet traffic was being divulged to a third party company. Even customers who happened to have read the policy would have had no way of knowing that their Internet communications were being examined by a third party, nor any way of knowing the identity of that third party.

36. Notably, Embarq's notice failed to meet even NebuAd's standards for its partners' notices. NebuAd claims that it required its ISP partners to notify their subscribers via email or postal mail at least 30 days before deployment of the NebuAd technology. NebuAd also claims to have required ISPs to disclose that they were working with a third party. Embarq's notice failed on all of these accounts.

37. ISPs' general lack of proximity to their subscribers makes designing robust privacy notifications a formidable challenge. Unlike web-based service providers whose sites subscribers may visit on a daily basis, such as search engines or social networks, Internet users have little incentive to visit their ISP's website. Frequent visits to search engines or social networks can create for Internet users a strong sense of their personal relationship or association with those sites; conversely, they are infrequently contacted by their ISPs, usually only to receive a bill. Despite the fact that an ISP transmits all of a subscriber's online communications, the subscriber is unlikely to feel as though he or she

is directly communicating with the ISP on a frequent basis, whereas it may be much more obvious to Internet users that they directly communicate with the Web sites they visit. This makes ISP notification challenging, because ISPs do not have a natural vehicle for gaining the attention of their subscribers.

**Opt-out**

38. Given how privacy-invasive it was for Embarq to divulge the entirety of its customers' Internet communications to a third-party company, the only notice and choice model that would have been remotely appropriate would have been a clear, unavoidable disclosure about the behavioral advertising system (including details of NebuAd's involvement) together with a facility for customers to provide informed, opt-in consent. Embarq would have needed to find a way (whether via email, postal mail, an online pop-up notice, or some other means) to ensure that every customer affected by the deployment saw the notice, had the opportunity to understand the implications of the system, and affirmatively agreed to participate. Designing such a robust opt-in consent regime presents a formidable challenge for any Internet service provider seeking to engage with its existing customer base, but in this case it would have been the only solution sufficient to the task of informing customers about the privacy risks involved and collecting data only from those customers willing to accept the risks.

39. This was not the path that Embarq chose. Embarq and NebuAd offered an opt-out option to Embarq customers in the deployment area. Within the privacy notice language mentioned above, Embarq included a link to a website where customers could

opt out. The notice mentions that opting out would result in customers receiving less relevant advertisements (that is, advertisements that were not behaviorally targeted by NebuAd). The opt-out was effectuated by NebuAd placing a cookie onto users' computers that indicated their opt out status.

40.   However, opting out did not prevent users from having all of their Internet activity divulged to NebuAd, nor did it prevent their web browsing, searches, and ad views from being extracted by the UTA and sent to the NebuAd footprint server. As documented by NebuAd, the determination about whether an opt-out cookie was present happened at the footprint server. The UTA was unaware about the opt-out status of individual customers, and therefore treated all customers' traffic the same, inspecting it for web activity and extracting that information to be sent onward to the footprint server.

41.   Because of this architecture, there was no mechanism by which Embarq customers in the deployment area could decline to have their traffic divulged to NebuAd and examined by the UTA. The only choice they were offered was to not have NebuAd use that data to create behavioral profiles and serve ads targeted to those profiles.

42.   This inadequate opt-out mechanism compounded the inadequacies of Embarq's notice. Not only did Embarq fail to accurately describe the disclosure and inspection of Internet traffic involved in the behavioral advertising system, it also offered customers a choice mechanism that failed to provide the privacy protections that customers were most likely seeking when they sought to opt out. NebuAd has stated that the behavioral profiles that it built were largely devoid of any sensitive or personal information, but rather reflected generic marketing interests. Between the disclosure of

all Internet traffic to a third party, the examination of that traffic, the extraction and transmission of virtually all web activity (including search terms), and the creation of a mostly non-sensitive, non-personal behavioral profile, the creation of the profile was likely the least of customers' concerns. Yet the only choice offered to customers was to decline the creation of the profile, leaving them with no choice whatsoever about the more privacy-invading activities of traffic disclosure and inspection.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of February, 2011, at Oxford, UK.

*Alissa Cooper*

Alissa Cooper
Center for Democracy & Technology
1634 Eye Street NW, Suite 1100
Washington, DC 20006
(202) 637-9800