PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY    **REDACTED**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **KATHLEEN KIRCH, et al.,** | **Case No. 10-2047-JAR-GLR** |
| **Plaintiffs,** | **DECLARATION OF ANDREW CASE** |
| **EMBARQ MANAGEMENT CO., et al.,** | |
| **Defendants.** | |

I, Andrew Case, hereby declare and state:

1.    My statements in this declaration are based on my personal knowledge and familiarity with the subject-matter of this declaration. If called on to testify about the matters addressed in this declaration, I would be willing and able to testify competently regarding those matters based on my familiarity and personal knowledge, except where my knowledge is based upon information and belief and, as to those matters, I understand and believe them to be true.

2.    This declaration relates to the use of NebuAd's targeted-advertising network architecture by Embarq. To summarize, this declaration addresses the broad scope of information Embarq enabled NebuAd to acquire; the unusual tracking methods NebuAd employed to track and profile Embarq customers across the entire Internet; NebuAd's use of customer data to generate competitive intelligence reports for ISPs; NebuAd's unsupported security claims; the atypical involvement of ISPs in the delivery of targeted advertisements; the ISP technical staff's level of awareness of

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

the NebuAd device and its purpose; and the inadequacy of Embarq's privacy policy in relationship to the actual operations of the NebuAd architecture—particularly in NebuAd's cross-domain analysis of other websites' cookies for purposes of identifying Embarq's customers.

## QUALIFICATIONS

3.      I make this declaration as an expert in the fields of computer security and digital forensics.

4.      I am a Senior Security Researcher at Digital Forensics Solutions, a provider of computer security and digital forensics investigations services to organizations and institutions.

5.      The services I provide to clients include:

(a)      *digital forensics investigations*—examining computer systems to reconstruct or identify causes of events and conditions on computer systems and networks;

(b)      *incident response handling*—verifying the existence and scope, identifying causes, and determining methods of mitigating the effects of ongoing or recently occurring incidents that pose threats to the confidentiality, integrity, security, and operability of computer systems and networks;

(c)      *code audits*—examining computer software code to identify and classify potential vulnerabilities through which the software could be exploited or

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

compromised and determining ways to remediate those vulnerabilities and mitigate the risks they pose;

    (d)   *network penetration tests*—proactively testing the security posture of corporate networks in order to identify risks and vulnerabilities and to assist in the remediation process of vulnerabilities found

6.    In providing these services, clients rely on my knowledge, skill, experience, and training in understanding and analyzing technologies such as computer network components, network communications protocols (including packet transfer), systems and application software, and the technologies and techniques for securing those resources.

7.    In addition, clients rely on my knowledge, skill, experience, and training in aligning policies and procedures with the technology-related standards and methodologies that apply to the deployment of network devices; network communications; data classification and prioritization of risks to data, software, and network assets; incident response; and the collection, preservation, and analysis of digital forensics evidence.

8.    To improve the efficiency of collecting digital evidence and expand the scope of digital evidence that can be meaningfully analyzed, I have personally developed a system to automate the capture and correlation of certain types of digital evidence. This system performs network traffic analysis, including comprehensive packet analysis (which is referred to in some contexts as "deep packet inspection" or

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

"DPI"), to scrutinize web site and web application functions, respond to network-based data exfiltration security incidents, reverse-engineer network protocols, analyze and extract packet contents, and execute a number of other tasks that require the correlation of network traffic with relevant information residing on the device from which the traffic originated—such as user data, log files, system registry entries, contents of volatile memory, or other information artifacts. My paper detailing this system[1] has been cited over fifteen times and has received considerable positive feedback and interest.

9.      My knowledge of network communications and of systems that perform packet analysis, particularly my skill and experience gained in developing the system described, are highly relevant to my analysis and conclusions in this matter because both involve the application of deep packet inspection techniques. That is, both involve the capture of all packets in a stream of network traffic from a user's device en route to a server for a given time period, the reading of the packets to identify those portions containing communications that utilize particular Internet protocols, and the extraction of the communicative content from selected packets. Although the digital forensics analysis performed by my system uses DPI for a different purpose than the system implemented by Embarq and NebuAd, both systems utilize DPI to analyze and

---

[1] A. Case, *et al.*, "FACE: Automated digital evidence discovery and correlation," Digital Investigation 5, Supplement 1 (2008), S65 – S75. *The Proceedings of the Eighth Annual Digital Forensic Research Workshop* (DFRWS) *Conference.*

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

extract communicative content from packets at the same "deep" layer of the same type of electronic transmission—Internet Protocol-based network traffic.

10.     Related to computer and network security, I have performed numerous source code audits, reverse engineering of malware and commercial binary applications, network and application penetration tests, and network architecture reviews.

11.     Related to digital forensics, I have performed numerous small and large-scale digital investigations as well as incident response engagements. I have also helped a number of companies develop incident response policies to promote minimization of risk, admissibility of evidence in legal proceedings, and establishment of a chain of command during incidents.

12.     I have worked as a researcher and developer on two government-funded research grants[2], both related to the fields of computer security and digital forensics.

13.     I have led training on incident response handling (including analysis of network data), digital forensics, and computer security to audiences of varying technical ability and to both private and public sector.

14.     As detailed in the list of my publications (Exhibit A), I have published and presented a number of peer-reviewed publications in the fields of computer security and digital forensics.

[2] Senior Developer, "REGISTRY DECODER: Automatic Acquisition and Reporting of Relevant Microsoft Windows Registry Contents," Award No. 2009-FD-CX-K102, National Institute of Justice, 2010–present

Student Participant, "Providing an Integrated Interface for Secure Computing,"  Space and Naval Warfare Systems Center, 2008

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

15.    Previously, I have been a security consultant for a computer security firm (Neohapsis, Inc.) and a network administrator responsible for configuration and security of clients' networks (Spirent Communications).

16.    I have a Bachelor of Science Degree in Computer Science from the University of New Orleans and am a Master's Degree candidate in that program. I am a GIAC (Global Information Assurance Certification) Certified Forensics Analyst (GCFA).

## MATERIALS CONSIDERED

17.    My statements in this declaration are based on my own subject-matter expertise and my analysis of materials I have reviewed as of the date of this declaration, including documents provided to me by attorneys from the law firms of KamberLaw, LLC and Panish Shea & Boyle LLP (marked NEBUAD0050-2671; NEBMV0001-3647; EQ0496-2851; the January 18, 2011 deposition testimony of Will Stelle), and the publicly available documents indicated below.

## OBSERVATIONS AND ANALYSIS

**A.    How did the NebuAd-enabled network architecture operate and what was its functionality?**

18.    The purpose of the NebuAd architecture was to monitor ISP customer web traffic in order to gain information for delivering targeted advertisements. To achieve this, the NebuAd network appliance was deployed in-line, meaning that it was placed directly in the flow of network traffic, so that it would be able to monitor and

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

modify all network traffic entering and leaving a particular ISP's network. The in-line device leveraged this position to employ deep packet inspection (DPI) on all customer data entering and leaving the network.

19.     Packets are layered sets of data that traverse a computer network, and DPI is the act of un-layering network packets in order to obtain or analyze the content of the innermost data. Unlike network routers, which only examine the outer layers of a packet in order to forward data along the network, devices performing DPI have complete access to all packet contents. This includes information such as E-mail messages, instant messenger chat sessions, web browsing activity, file uploads and downloads, online gaming, and all other Internet based activity.

20.     The NebuAd architecture utilized DPI in order to collect information from an ISP's customers in order to uniquely profile them for the purposes of targeted, behavioral advertising. Unlike typical web-based advertising, which can only profile users when they visit websites that are within the network of websites served by that advertising company, the NebuAd device allowed for tracking of activity across the entire Internet. This ability to track customer activity across the entire Internet was a selling point of the architecture and was clearly expressed as a competitive advantage in a number of the considered NebuAd publications and manuals. To achieve this tracking, NebuAd's device utilized DPI to identify unencrypted, web-based traffic (HTTP), and then parsed the packets in order to isolate search terms, information from online forms, and other customer-specific data. This captured information, along with

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

a hashed version of the subscriber's IP address, was then sent to servers outside of the local ISP network. ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████

21.     According to the testimony of NebuAd CEO Bob Dykes (http://archives.energycommerce.house.gov/cmte_mtgs/110-ti-hrg.071708.Dykes-testimony.pdf), and a technical report by Robert M. Topolski, "NebuAd and Partner ISPs: Wiretapping, Forgery and Browser Hijacking" (http://www.freepress.net/files/NebuAd_Report.pdf), NebuAd also utilized methods other than DPI to track ISP customers: the NebuAd device modified HTTP responses in order to insert JavaScript that allowed NebuAd to track users on websites outside of NebuAd's advertising network. This JavaScript, which was inserted on pages outside of NebuAd's advertising network, was used to load a cookie on the user's machine and to store information necessary for NebuAd to later serve the user targeted advertisements. As previously stated, normally, an online advertising company is limited to interacting with users only when those users visit websites within the advertising company's network. NebuAd, by placing JavaScript at the end of arbitrary web requests, was able to bypass this restriction. For example, in Mr. Topolski's technical report, it is shown that NebuAd was placing code at the end of Google's home page. Mr. Topolski also states that he confirmed with Google that they had no contractual

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

agreement with NebuAd or any of its partner companies.  Since the cookie was created under the domain of a NebuAd partner, *faireagle.com* in the cited research report, when tracked users visited websites within NebuAd's advertising network, the cookie could be read in order to contact the NebuAd processing architecture and receive a targeted advertisement.  By placing cookies on user's browser even when they are not interacting with NebuAd's advertising network, the NebuAd UTA ensured that users could be uniquely tracked across all domains.  Also, unless NebuAd placed an expiration date on the cookies it placed or users have since changed their web browser or operating system, NebuAd's cookies would still be resident on the Embarq customers tracked by the NebuAd architecture.

**B.    How did NebuAd fulfill its security claims?**

22.



**C.      Were the Nebuad device's functions aligned with normal ISP operations?**

26.      While packet monitoring technologies have appropriate roles within an ISP, unique tracking of customers for the purposes of behavioral advertising is not one. Regularly accepted uses of DPI include troubleshooting (in order to determine the source of errors), security monitoring, such as checking e-mail attachments for viruses, enforcement of copyright protection, and bandwidth throttling to meet quality of service (QOS) guarantees. DPI, for the purpose of behavioral advertising, is outside of the normal scope of ISP operations. That behavioral advertising was not a normal function of ISPs was noted by Bob Dykes, NebuAd CEO, in his testimony to the House Subcommittee on Telecommunications and the Internet when he stated that NebuAd partnered with ISPs in order to bring them into the advertising market. Furthermore, in Embarq's response to Congress (EQ02789-02792), it was stated that the company would no longer use such technologies until the privacy concerns had been addressed, demonstrating the non-essential nature of the application of DPI in the business models of NebuAd's ISP customers. In its response, Embarq made no complaint that its business would be unable to continue without the NebuAd device or another similarly purposed device. This reinforces that the fact that such operations are unnecessary for functional ISP operation.

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

27.    As reported in Mr. Topolski's report, "NebuAd and Partner ISPs: Wiretapping, Forgery and Browser Hijacking" (http://www.freepress.net/files/-NebuAd_Report.pdf), the NebuAd architecture also engaged in forgery of IP addresses and network port numbers in order to synchronize NebuAd's JavaScript code within the normal flow of the HTTP traffic. To successfully accomplish this, the device not only had to represent itself as a foreign server (google.com, in the referenced paper), but it also had to manipulate sequence numbers used by the TCP protocol to ensure reliability of communications. This direct modification of network traffic and masquerading as foreign servers is far outside of the scope of an ISPs normal business, and was performed solely to track ISP customers throughout their online browsing sessions. These actions also constitute packet forgery, as original packets are modified in-stream, as well as a code injection attack as JavaScript is placed within an HTTP response.

28.    



**D.    To what extent would the operations of the NebuAd device have been apparent to ISP technical staff?**

29.    The NebuAd product documentation, brochures, manuals, and other relevant materials considered indicate that ISP technical staff would be aware that the NebuAd device would be placed on the network and of its purpose.

30.    Network staff who routinely diagnose, maintain, and update equipment on the network would become aware of a device with such an active presence on the network, such as the UTA. Networking monitoring tools, commonly used by ISPs to quickly detect issues on the network, would have also alerted network personnel to this change in configuration. The mere placement of the device within the network, one of the last hops before leaving the ISP network, would have also alerted ISP staff to the fact that the device was capable of monitoring and manipulating all customer traffic.

31.    In the specific instance of Embarq's use of the NebuAd device, Section 1.1 of the Technology Trial Evaluation Agreement between Embarq and NebuAd (EQ02083-2095) states that NebuAd will install devices at mutually agreed upon

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

location(s) within the ISP network. The selection of the installation location(s) would have necessarily required planning with technical staff. In addition, the involvement of Embarq's technical personnel is indicated by NebuAd's agreement in Section 3.2 to adhere to Embarq's data security requirements.

32.     Also, in the specific instance of Embarq's use of the NebuAd device, the Customer Test Plan for Embarq NebuAD UTA-100 (EQ01493-1507), section 2.1 lists a number of "Customer Responsibilities" which include providing a equipment for a lab testing environment as well as a "test engineer" for "configuration verification of devices in the lab."

33.     Finally, in the deposition of Mr. Will Stelle about the installation and testing of the NebuAd appliance within Embarq's infrastructure, the process of how the device was installed and tested was given. This includes the creation and distribution of a "plan" by the "network planning team" and the delivery of the plan to the "operations team" who performed the tasks outlined in the plan. It was also revealed that three technical members from Embarq were involved in the project along with two engineers from NebuAd. Mr. Stelle also testified that NebuAd had informed him during this process that the device in place performed DPI in order to determine advertising relevant to a specific user. Testing of the device by an Embarq employee named "Gregorz" is also discussed, including his performance monitoring of the device as it was placed on the lab network. Mr. Stelle also stated specifically that he was aware that HTTP traffic was processed by the NebuAd device.

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

**E.** **How were Nebuad's activities reflected in notices to ISP customers?**

34. 

35.     According to Embarq's July 23, 2008 response to Congressional com-

mittee inquiries (EQ02789-02792), Embarq did not follow these steps. In the re-

sponse, it was stated that only two weeks' notice was given to subscribers and that, in

order to inform subscribers, the website was updated with the certain information. No

mention of postal mail or e-mails to subscribers was noted in this response. There is

also no mention of the "Cookie Notice," ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇ a notice that was meant to notify subscribers that if they deleted

PORTIONS HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY

their cookies or if they changed their web browsers or the operating systems on their computers, they would then need to opt-out again.

36.    Also, the privacy policy update that was provided with Embarq's response to the Congressional inquiry did not fully disclose the nature of the activities that were being performed by NebuAd's technology. For instance, Embarq's privacy policy update only mentioned websites visited and online searches in its list of data sets from which user information would be collected in order to deliver targeted advertisements. Based on reviewed documents, including NebuAd's architecture descriptions (*e.g.*, NEBUAD00471-544) and the Ponemon Institute's Privacy Review (NEBUAD001439-1460), other user information was acquired in this information collection process, such as the subscriber's IP address, browser and operating system types and versions, and non-NebuAd cookies.

37.    



38.     The privacy policy also omits any mention of the device's ability to manipulate and forge network traffic, both leaving and entering the network. Since this capability was used to track customers across the Internet, through placing JavaScript at the end of legitimate webpages, its omission seems unreasonable, and makes the privacy policy inadequate as a fair notice to customers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of February, 2011, at New Orleans, Louisiana

*Andrew Case*
ANDREW CASE
Digital Forensics Solutions, LLC
1215 Prytania Street
Suite #207
New Orleans, LA 70130
Tel.:  504-874-0787
Fax:  504-529-9575
www.digitalforensicssolutions.com

Declaration of Andrew Case                     19

**DECLARATION OF ANDREW CASE**

**EXHIBIT A**

# ANDREW CASE

# PUBLICATIONS

## Journal and Conference Publications

A. Case, "Forensic Memory Analysis of Android's Dalvik VM," *Proceedings of the 2011 Source Seattle Conference,* Seattle, WA, *publication forthcoming.*

A. Case, "De-Anonymizing Live CDs through Physical Memory Analysis," *Proceedings of the 2011 Blackhat D.C. Briefings*, Washington, DC, 2011

A. Case, L. Marziale, C. Neckar, G. G. Richard III, "Treasure and Tragedy in *kmem_cache* Mining for Live Forensics Investigation," *Proceedings of the 10th Annual Digital Forensics Research Workshop (DFRWS 2010)*, Portland, OR, 2010

A. Case, L. Marziale, G. G. Richard III, "Dynamic Recreation of Kernel Data Structures for Live Forensics," *Proceedings of the 10th Annual Digital Forensics Research Workshop (DFRWS 2010)*, Portland, OR, 2010

A. Case, A. Cristina, L. Marziale, G. G. Richard III, V. Roussev, "FACE: Automated Digital Evidence Discovery and Correlation," *Proceedings of the 8th Annual Digital Forensics Research Workshop (DFRWS 2008)*, Baltimore, MD, 2008

## Conference Presentations and Panels

"De-Anonymizing Live CDs through Physical Memory Analysis," *Proceedings of the 2011 Blackhat D.C. Briefings*, Washington, DC, 2011

Invited panelist, "The Future of Forensics Memory Analysis," Digital Forensics Research Workshop (DFRWS 2010), Portland, OR, 2010.

"Treasure and Tragedy in *kmem_cache* Mining for Live Forensics Investigation," 10th Annual Digital Forensics Research Workshop (DFRWS 2010), Portland, OR, 2010.